IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THOMAS E. KATIS,<br><br>          Plaintiff,<br><br>v.<br><br>NCAP HOLDINGS, LLC, et al.,<br><br>          Defendants. | **MEMORANDUM DECISION AND ORDER DENYING SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00556-CW-CMR<br><br>Judge Clark Waddoups |

Before the court are the parties' competing motions for summary judgment. (ECF Nos. 27, 30.) In their motion, Defendants argue that summary judgment should be granted against Plaintiff Thomas E. Katis's claim for declaratory relief because it is barred by the doctrine of claim preclusion. Katis, on the other hand, denies that claim preclusion is applicable to bar his claim and seeks summary judgment and a declaration that Defendant Chamtech Technologies, Inc. (hereinafter "Technologies") is a successor of non-party Chamtech Enterprises, Inc. (hereinafter "Enterprises") and, therefore, liable for a judgment Katis has obtained against Enterprises, and that Defendant nCap Holdings, LLC (hereinafter "nCap") is a successor of Technologies.[1]

The court concludes, for the reasons stated below, that the parties have failed to meet their burdens to obtain summary judgment.

---

[1]      Katis's complaint also alleges that Defendants are alter egos of Enterprises, but Katis does not seek summary judgment on his alter ego claim.

**Background**

Chamtech Enterprises, Inc. was incorporated in the state of Utah by Anthony Sutera in April 2010. (*See* Articles of Inc., Ex. 12 to Katis Mot. for Summ. J., ECF No. 32-14.) Enterprises was formed for the purpose of pursuing business opportunities relating to a technology developed by Sutera and Rhett Spencer that utilized nanometer-sized particles to create antennas that are smaller in dimension than normal sized wire antennas (hereinafter "nCap Technology"). (*See* Dep. of Rhett Spencer at 15:5-17:8, ECF No. 32-4.)

Between March 17, 2011 and October 27, 2011, Katis loaned Enterprises $1.3 million in exchange for four convertible promissory notes (hereinafter "Notes"). (*See* Convertible Promissory Notes, ECF No. 29-1 at Exs. 2-5.) Each Note initially matured one year from the date it was entered, and each note provided Katis with the right to convert the principal and accrued interest owed under the note into Enterprises stock by giving Enterprises written notice, at least five days before the maturity date, of his election to convert the Note into conversion stock. (*See id.*) Upon election, the principal and accrued interest owed under the Notes would automatically convert to Enterprises stock, at a price determined by a formula set forth in the Notes, one business day after the date of maturity. (*Id.*)

On September 29, 2011, Chamtech Technologies, Inc. ("Technologies") was incorporated in the state of Delaware. (*See* Certificate of Incorp., ECF No. 29-1 at Ex. 8.) Shortly thereafter, on or around November 15, 2011, it appears that each of the shareholders of Enterprises transferred their Enterprises stock to Technologies in exchange for Technologies stock, making Technologies the sole shareholder of Enterprises. (*See* Unanimous Consent of Bd.

2

of Dir. of Chamtech Technologies, Inc., dated Nov. 15, 2011 (hereinafter "November 2011 Resolution"),[2] ECF No. 29-1 at Ex. 8.)

Around the same time, in November 2011, Rhett Spencer, Eric Hernandez, and Anthony Sutera, the inventors on a patent relating to the nCap Technology, assigned their rights in the patent to Technologies. (*See* Assignment, ECF No. 27-1 at Ex. 12.)

Katis was not aware of the formation of Technologies, or the transfer of Enterprises' ownership to Technologies, until several months later.[3] Upon learning of Technologies ownership of Enterprises, he demanded that the Notes be amended to provide for conversion into Technologies, rather than Enterprises, stock.

On October 28, 2012, an agreement was entered that was intended to account for Technologies' ownership of Enterprises (hereinafter "October 2012 Amendment"). (*See* October 2012 Amendment, ECF No. 29-1 at Ex. 14.) The October 2012 Amendment provides:

---

[2]     The November 2011 Resolution is internally inconsistent in that its title makes reference to the board of directors of Technologies, but its first paragraph purports to be a resolution of the board of directors of Enterprises. Moreover, the resolution uses the term "Company" throughout, which is expressly defined to be a reference to Enterprises, not Technologies. As a result, the resolution purports to authorize the issuance of Enterprises stock in exchange for Enterprises stock, which is nonsensical. Neither party has offered any explanation for this inconsistency. Nevertheless, the parties do not appear to dispute that at some point each of the shareholders of Enterprises exchanged their Enterprises stock for Technologies stock, making Technologies the sole shareholder of Enterprises.

[3]     The parties appear to dispute the exact date that Katis became aware of Technologies' existence and ownership of Enterprises. Defendants argue that Katis was notified of Technologies' status as the sole shareholder of Enterprises when he was sent a capitalization table for Technologies referring to it as the "Holding Company of Chamtech Enterprises, Inc." (*See* Capitalization Tables, ECF No. 29-1 at Ex, 7.) As Katis correctly points out, however, the capitalization table he received for Enterprises showed individual, rather than corporate, ownership of 100% of Enterprises stock, contradicting the assertion that Enterprises was owned by Technologies at the time. (*See id*.) Nevertheless, for the reasons discussed below, the exact date of Katis's discovery of Technologies' ownership of Enterprises is not material to either of the motions at hand.

> In order to properly reflect the parties' intentions that the notes will provide for conversion into capital stock of Technologies, the parent company of Enterprises, rather than capital stock of Enterprises, the parties hereby agree that any reference, in any of the Notes, to Enterprises' "capital stock," "securities," "stock options," "equity incentive or stock option plan," "common stock," or "voting securities" shall be deemed instead to refer to Technologies' "capital stock," "securities," "stock options," "equity incentive or stock option plan," "common stock," or "voting securities." Technologies undertakes to perform all obligations otherwise required to be performed pursuant to the Notes by Enterprises with respect to the "capital stock," "securities," "stock options," "equity incentive or stock option plan," "common stock," or "voting securities" of Technologies. Upon any conversion of the Notes into Conversion Stock (as defined in the Notes), Technologies will be the issuer of the Conversion Stock rather than Enterprises.

(*Id*. at ¶ 2)  The October 2012 Amendment also extended the maturity date of each of the Notes to January 31, 2013. (*Id*. at ¶ 1.)

The express language of the October 2012 Amendment identifies only Katis and Enterprises as parties to the agreement. (*See id*., ("For and in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, *you and Enterprises hereby agree* as follows:") (emphasis added).) The agreement, however, was printed on Technologies letterhead and purports to impose obligations on Technologies. (*Id*.)

Moreover, the agreement was signed by Mr. Sutera as "President and Chief Executive Officer," but there is no indication in the agreement whether Mr. Sutera signed the agreement in his capacity as President and CEO of Enterprises, Technologies, or both. (*Id*.)

4

Enterprises failed to pay Katis the amounts it owed under the Notes, which became due and payable on February 1, 2013, the first business day following the maturity date. (*See, e.g.*, Promissory Note at § 2.2, ECF No. 29-1 at Ex. 2.)

On June 19, 2013, Katis brought an action against Enterprises for breach of the Notes (hereinafter the "Original Action"). (*See* Original Action Compl., ECF No. 29-1 at Ex. 15.) Summary judgment was granted in Katis's favor, and a Final Judgment was entered against Enterprises in the Original Action in the amount of $1,633,282.29 on January 12, 2015 (hereinafter the "Judgment"). (*See* Judgment, ECF No. 29-1 at Ex. 16.)

On December 30, 2013, after the Original Action was initiated, but before the Judgment was entered, the directors of Technologies adopted a resolution authorizing the organization of a new limited liability company named nCap Holdings, LLC ("nCap"). (*See* December 2013 Resolution, ECF No. 32-15.) The resolution indicated that the purpose of the new LLC was "to achieve certain tax advantages for distribution to existing and future investors through a tax partnership structure." (*Id*.) nCap's initial managers were Anthony Sutera, Rhett Spencer, and Douglas Morris. (*Id*.) Spencer testified that nCap was created soley for the purpose of obtaining tax savings and not to facilitate any debt avoidance. (Spencer Dep. at 25:14-26:2; 27:6-11, ECF No. 32-4.)

On or around March 20, 2014, the board of directors of Technologies adopted a resolution authorizing the execution of a Master License Agreement with nCap, which granted nCap a nonexclusive license to use all of Technologies intellectual property, which consisted of, among other things, several patents relating to the nCap Technology. (*See* March 20, 2014 Resolution & Master License Agreement, ECF No. 45-6.) In order to allow the Master License

Agreement to be granted to nCap, Technologies' board also authorized Technologies to execute

an amendment to a Field of Use License Agreement it had previously entered with Enterprises,

on January 31, 2013, that granted Enterprises authority to sublicense the nCap Technology to the

United States. The amendment to the Field of Utah License modified the license granted to

Enterprises from an exclusive to nonexclusive right to sublicense the nCap Technology to

government parties. (*See* March 20, 2014 Resolution & Amendment to Field of Use License

Agreement, ECF No. 45-6.)

On or around October 1, 2014, the board of directors of Technologies adopted another

resolution authorizing the execution of an agreement to transfer most of its intellectual property

interests to nCap (hereinafter the "Distribution and Contribution Agreement"). (*See* October 1,

2014 Resolution, ECF No. 32-17.) Under the agreement, which was made between

Technologies, its shareholders, and nCap, Technologies' shareholders were to receive a

distribution from Technologies of most of Technologies' intellectual property rights and then

distribute that intellectual property to nCap in exchange for a membership interest in nCap

equivalent to each shareholder's relative equity interest in Technologies. (*See* Distribution and

Contribution Agreement, ECF No. 32-17.)[4] The agreement provided, however, that

Technologies would retain the right to license the nCap Technology for use by the United States

government. (*See id*. at § 1.)

In the same resolution, Technologies' board of directors authorized the execution of two

amended license agreements granting non-exclusive licenses to both nCap and Enterprises to use

---

[4]    No fully executed copy of the Distribution and Contribution Agreement has been made a
part of the record. Nevertheless, the parties do not appear to dispute that the transaction
described in the Distribution and Contribution Agreement was effectuated.

or sublicense the nCap Technology for use by the United States government. (*See* October 1, 2014 Resolution; Amended and Restated Master License Agreement (with nCap); and Amended and Restated Field of Use License Agreement (with Enterprises), ECF No. 32-17.)[5]

On August 5, 2019, Katis initiated the current action against Technologies and nCap, seeking a declaratory judgment that Technologies and nCap are liable for the Judgment entered against Enterprises in the Original Action under theories of alter ego and successor liability. (*See* Compl, ECF No. 2.)

## Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

---

[5]    Like the Distribution and Contribution Agreement, executed copies of Technologies' amended license agreements with nCap and Enterprises have not been made part of the record. The parties, however, do no appear to dispute that the licenses described therein were granted.

<u>Analysis</u>

I.      **Defendants' Motion for Summary Judgment.**

Defendants seek summary judgment on the grounds that Katis's claims (1) are barred by claim preclusion, (2) constitute equitable remedies that are unavailable because of Katis's possession of a legal claim against Technologies, and (3) barred by the statute of limitations applicable to claims based on a written agreement. For the reasons discussed below, genuine disputes of material fact preclude the court from granting summary judgment in Defendants' favor on any of these bases.

A.      **Genuine Disputes of Material Fact Preclude Summary Judgment on Grounds of Claim Preclusion.**

Defendants first argue that summary judgment should be granted against Katis's claims because they are barred by the doctrine of claim preclusion.

Because the Original Action was brought in federal court, and resulted in a federal judgment, it is federal law that determines the claim preclusive effects of that judgment. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001) ("[F]ederal common law governs the claim-preclusive effect of a dismissal by a federal court sitting in diversity.") (citation omitted). Where, as in this case, however, the Original Action was brought pursuant to the court's diversity jurisdiction, with the substantive rules of decision provided by state law, federal courts adopt, "as the federally prescribed rule of decision, the law that would be applied by state courts in the State in which the federal diversity court sits." *Id.* (citation omitted). *See also In re Zwanziger*, 741 F.3d 74, 77 (10th Cir. 2014) (quoting *Semtek*, 531 U.S. at 508) ("The federal prescribed rule of decision to determine the preclusive effect of a diversity court's judgment is the law that would be applied by state courts in the State in which the federal

diversity court sits.") (internal quotation marks omitted). Therefore, because the Original Action

was brought in Utah federal court, the court must apply Utah law to determine whether Katis's

claims in this action are barred by the doctrine of claim preclusion.

To establish that claim preclusion bars a subsequent cause of action under Utah law, a

plaintiff must establish three elements:

> First, both cases must involve the same parties or their privies.
> Second, the claim that is alleged to be barred must have been
> presented in the first suit or must be one that could and should
> have been raised in the first action. Third, the first suit must have
> resulted in a final judgment on the merits.

*Macris & Assoc., Inc. v. Neways, Inc.*, 2000 UT 93, ¶ 20, 16 P.3d 1214 (citations omitted).

There is no dispute that the Original Action resulted in a final judgment on the merits or

that Katis is the plaintiff that brought both this action and the Original Action. Thus, in order to

obtain summary judgment, Defendants must come forward with evidence showing that there is

no genuine dispute of material fact that (1) Technologies and nCap are privies of Enterprises, for

purposes of claim preclusion, and (2) that Katis could and should have raised the claims he is

pursuing in this case in the Original Action.

The court will first address whether the claims pursued by Katis in this action could and

should have been pursued in the Original Action.

Defendants argue that the claims asserted by Katis in this action arise out of the same

contracts that were at issue in the Original Action—the Notes, including the October 2012

Amendment. According to Defendants, the October 2012 Amendment provided Katis with a

remedy against Technologies for Enterprises' breach of the Notes that could have been pursued

in the Original Action. And because that remedy arises from the same series of connected

transactions that were at issue in the Original Action, Katis was required to pursue it in the

Original Action and is, therefore, barred by claim preclusion from pursuing it in this action.

Katis argues that Defendants mischaracterize the claims he is pursuing in this action.

More specifically, he contends that he is not seeking a remedy in this action for breach of the

Notes, or the October 2012 Amendment. Instead, he is seeking to enforce the Judgment obtained

in the Original Action through theories of successor or alter ego liability.[6] Katis contends that

because his successor liability and alter ego claims depend on a different set of facts and

evidence than were at issue in the Original Action, he should not be barred from pursuing them

in this action under the doctrine of claim preclusion. Moreover, he argues that there is a dispute

of fact regarding whether the facts supporting his alter ego and successor liability claims arose

after the Original Action was commenced.

The court agrees that Katis is not pursuing a claim in this action based on breach of

contract. In his Amended Complaint, Katis asserts a single cause of action seeking a declaratory

judgment stating that "Defendants are alter egos and/or successors of [Enterprises] who are each

liable to Mr. Katis for the Judgment amount." (*See* Am. Compl. at ¶ 57, ECF No. 6.) Nothing in

the Amended Complaint suggests that Katis is pursuing a claim in this action for breach of the

Notes or the October 2012 Amendment. Accordingly, Defendants' argument that any breach of

contract remedy sought in this action is barred by claim preclusion is inapposite. Katis is not

---

[6]    In their reply memorandum, Defendants admit that Katis has not brought a claim in this action for breach of contract but argue, nonetheless, that he is barred from pursuing his alter ego and successor liability claims in this action because they are equitable remedies that are barred because he could have pursued a legal remedy through a breach of contract claim against Technologies in the Original Action. (*See* Defs.' Reply Mem. at 13-14, ECF No. 62.) This equitable remedies argument is distinct from Defendants' claim preclusion argument and will be addressed in a separate section below.

pursuing any breach of contract remedies in this case.

The question here, then, is whether there is a sufficient identity between Katis's alter ego and successor liability claims brought against Defendants in this action and the breach of contract claim pursued against Enterprises in the Original Action to warrant application of claim preclusion.

The Utah Supreme Court addressed a similar question in *Macris & Associates, Inc. v. Neways, Inc.*, 2000 UT 93, 16 P.3d 1214.[7] In *Macris*, the plaintiff sued a multi-level marketing ("MLM") company called Images & Attitudes ("Images") for breach of a distribution agreement. *Id*. at ¶ 4. One month before trial was set to begin in the case against Images, Thomas Mowers, the President of Images, incorporated Neways, Inc., another MLM company with Mowers as its President. *Id*. at ¶ 5. Shortly after the incorporation of Neways, Images shut down its business and transferred most of its assets to Neways and Neways took over Images' MLM operations. *Id*.

The initial trial date in the action against Images was continued for over two years, but two days before the rescheduled trial was set to begin, Macris initiated a separate action against Neways, asserting claims for fraudulent transfer, alter ego, and successor liability. *Id*. at ¶¶ 6-7. Judgment was later entered against Images in the initial case. *Id*. at ¶ 6.

In the subsequent action, Neways moved for summary judgment on the grounds that

---

[7]     Defendants attempt to distinguish *Macris* from this case on the grounds that *Macris* did not address "the highly unusual fact present here: the putative plaintiff actually entered into a direct contractual relationship with the entity that the plaintiff then sought to collect against on successor liability and alter ego theories rather than *on the contract it actually had*." (Defs.' Reply Mem. at 15, ECF No. 62 (emphasis in original).) Defendants, however, provide no reasoned explanation why *Macris* should not apply to their claim preclusion arguments in this case. Defendants' contentions regarding the purported contract between Katis and Technologies goes to their separate argument regarding the availability of an adequate legal remedy, which, as noted above, will be discussed in a separate section below.

Macris's claims were barred by res judicata and should have been brought in the initial action against Images. *Id*. at ¶ 9. The trial court declined to apply claim preclusion to bar Macris from holding Neways liable for the judgment entered against Images. *Id*. at ¶ 12.

On appeal, the Utah Supreme Court affirmed the trial court's decision on two grounds. First, the court held that Macris's claims against Neways were not barred by claim preclusion because they did not arise until after the initial action against Images was commenced. Citing precedent from several other jurisdictions, the court explained that "parties are required to include claims in an action for res judicata purposes only if those claims arose before the filing of the complaint in the earlier action." *Id*. at ¶ 26 (citations omitted). Because the facts supporting Macris's claims against Neways—"Image's transfer of its assets to Neways and Neways's subsequent takeover of Images's business"—did not arise until after its action against Images had already been commenced, Macris was not obligated to raise those claims in the initial action and could not be barred by claim preclusion from raising them in a separate suit. *Id*. at ¶ 27.

Second, the court held that Macris's claims against Neways were not identical to Macris's breach of contract claim against Images. The court explained that when considering whether claims are identical for res judicata purposes, it focuses on whether "the two causes of action rest on a different set of facts and [whether] evidence of a different kind of character is necessary to sustain the two causes of action." *Id*. at ¶ 28 (citing *Schaer v. State By and Through Utah Dep't of Transp.*, 657 P.2d 1337, 1340 (Utah 1983)). Thus, "even if a plaintiff is aware of the factual basis of a suit at the filing of another suit, he or she is not obligated to bring all claims together if there is no identity of facts and evidence between the two claims." *Id*.

The court held that Macris's claims against Images were not identical to its claims against

Neways for res judicata purposes, explaining:

> Macris I arose out of the formation of a distributorship agreement
> between Macris and Images in August 1989 and Images's 1991
> breach of that agreement. In Macris I, Macris and Images litigated
> whether an enforceable agreement existed between the parties,
> whether Images breached that Agreement, and the amount of
> damages that should be awarded for that breach.
>
> In contrast, Macris II arose out of the formation of Neways in
> August 1992, the transfer by Images of its assets to Neways on
> September 1, 1992, three days before the original trial date in
> Macris I, and Neways's subsequent takeover of Images's multilevel
> marketing business. Macris based its claims in Macris II on the
> Utah Fraudulent Transfer Act and similar common law doctrines
> designed to protect creditors from the evasions of debtors.
> Specifically, Macris claimed that Images's transfer of its assets to
> Neways three days before the trial in Macris I was scheduled to
> begin was fraudulent and accomplished to limit the amount of
> damages available to Macris and to hinder Macris from collecting
> the obligation owed by Images.
>
> Accordingly, it is clear that Macris's claims against Neways in
> Macris II rest upon a different set of facts, and evidence of a
> different kind or character is necessary to sustain the claims, than
> the breach of contract litigation that was the subject of Macris I.
> Therefore, even if Macris had known of the relevant facts of
> Macris II at the filing of Macris I—and it did not—it still would
> have been justified in not including its fraudulent transfer,
> successor liability, and alter ego claims in the first lawsuit.

*Id*. at ¶¶ 29-31. *Cf. Daewoo Elec. Am., Inc. v. Opta Corp.*, 875 F.3d 1241, 1251 (9th Cir. 2017)

(action pursuing alter ego and successor liability claims was not barred by claim preclusion as

result of judgment in prior contract action "[b]ecause the two actions asserted distinct theories of

liability to seek redress for different harms, and because the facts and evidence material to each

action did not significantly overlap").

Like in *Macris*, there is at least a genuine dispute of material fact in this case regarding

whether Katis's causes of action against Defendants for alter ego and successor liability arose before or after the Original Action was initiated against Enterprises. As an initial matter, there is no dispute that nCap was not organized until at least December 2013, at least six months after the Original Action was commenced in June 2013. Therefore, Katis could not have brought his claims against nCap when the Original Action was commenced and, as explained in *Macris*, he was not required to amend his complaint in the Original Action to add nCap as a party later.

Genuine disputes of fact exist regarding when Katis's claims against Technologies arose as well. While there is evidence that Katis was aware, or should have known, that Technologies acquired all of Enterprises' stock before the Original Action was commenced, proof that Technologies was the "holding company" of Enterprises is not sufficient, by itself, to establish alter ego or successor liability.

As a prerequisite for establishing successor liability, Katis is required to show a transfer of all, or nearly all, of Enterprises' assets to Technologies. *See Macris & Assoc.*, 1999 UT App 230 at ¶ 15. But neither Defendants nor Katis have come forward with evidence showing if or when such a transaction occurred. Accordingly, the court cannot conclude, as a matter of law, that Katis's successor liability claim against Technologies accrued prior to commencement of the Original Action.

Similarly, to establish alter ego liability, Katis is required to show that "the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow." *Jones & Trevor Mktg. v. Lowry*, 2012 UT 39, ¶ 14, 284 P.3d 630. There is no evidence that Technologies' mere status as the "holding company" of Enterprises could satisfy the fraud or injustice element of an alter ego claim. Thus, to sustain a claim for alter ego, Katis must rely on

14

additional facts. Neither party, however, has shown that the additional facts necessary to establish Katis's alter ego claim existed when the Original Action was commenced. Thus, the court cannot conclude, as a matter of law, that Katis's alter ego claims accrued prior to the Original Action either.

Moreover, as the court held in *Macris*, even if all of the claims asserted in this action had accrued and were known to Katis before the Original Action commenced, claim preclusion does not apply to bar them in this action because they are based on different legal theories and a different set of facts and evidence than those that were pursued in the original action.[8]

In the Original Action, Katis brought a single claim for breach of the Notes against Enterprises. The facts relevant to that claim were facts relating to the execution of those notes between March and October 2011, and facts relating to Enterprises' failure to fulfill its obligations under the Notes when they matured in February 2013.

In contrast, the execution and breach of the Notes by Enterprises has little to do with the

---

[8]     In support of their contention that Katis's alter ego claims can be barred by claim preclusion, Defendants cite this court's decision in *Pension Fund of Eight Dist. Elec. Pension Fund v. Wasatch Front Elec. and Constr., LLC*, Case No. 2:09-cv-0632, 2012 WL 2090061 (D. Utah. June 8, 2012) (unpublished), asserting that the court has "already concluded that alter ego claims can be barred by claim preclusion when such claims could have been brought initially." (Defs.' Mot. at 15, ECF No. 29.) That is true as far as it goes. But the fact that some alter ego claims may be barred by claim preclusion in some cases does not mean that the successor liability and alter ego claims that Katis is pursuing in this case are barred.

*Pension Fund* is distinguishable from the current case. As an initial matter, because the original judgment at issue in *Pension Fund* was obtained in an action brought pursuant to the court's federal question jurisdiction, federal, rather than Utah, preclusion law applied and, thus, the Utah Supreme Court's decision in *Macris* was inapplicable. Perhaps more significantly, the plaintiffs in *Pension Fund* had brought an alter ego claim in the original action at issue in that case against one of the defendants in the subsequent case. Thus, unlike in this case, there was a significant overlap in the facts and evidence relevant to the alter ego claims pursued in both cases at issue in *Pension Fund*.

merits of the claims asserted by Katis in this action. Rather, Katis's alter ego and successor liability claims depend on facts relating to the formations of Technologies and nCap, the purported transfer of assets from Enterprises to Technologies, the purported transfer of assets from Technologies to nCap, the alleged unity of interest and operations among Enterprises, Technologies, and nCap, and the purported fraud or injustice that might occur if the Defendants are permitted to maintain their separate legal identities.

In short, the facts and evidence that will be at issue in this case are not the same as those that were at issue in the Original Action and, therefore, the claims asserted in this action are not identical to the claims asserted in the Original Action.[9] Accordingly, Defendants' motion must be denied to the extent it is based on a theory of claim preclusion.

### B.   Genuine Disputes of Fact Preclude Summary Judgment on Grounds that Katis Possessed an Adequate Legal Remedy against Technologies.

As noted above, Defendants separately argue that Katis is barred from pursuing his alter ego and successor liability claims in this action because he had an adequate legal remedy against Technologies that could have been pursued in the Original Action. According to Defendants, alter ego and successor liability are equitable remedies that are unavailable to Katis because he had a direct legal remedy against Technologies under the October 2012 Amendment.[10]

Defendants' adequate legal remedy argument is premised on Defendants' contention that the October 2012 Amendment constituted a contract between Technologies and Katis that made

---

[9]     Because Defendants have failed to show identity between the claims asserted in this case and the claim asserted in the Original Action, the court need not reach the question of whether Defendants were in privity with Enterprises for purposes of claim preclusion.

[10]    Defendants do not argue that Katis had a direct legal remedy against nCap under the October 2012 Amendment. Instead, they contend that nCap can only be held derivatively liable for the Judgment if Technologies is first found to be the successor or alter ego of Enterprises.

Technologies jointly liable with Enterprises under the Notes. The October 2012 Amendment

states, in relevant part:

> In order to properly reflect the parties' intention that the Notes will
> provide for conversion into capital stock of Technologies, the
> parent company of Enterprises, rather than capital stock of
> Enterprises, the parties hereby agree that any reference, in any of
> the Notes, to Enterprises' "capital stock," "securities," "stock
> options," "equity incentive or stock option plan," "common stock,"
> or "voting securities" shall be deemed instead to refer to
> Technologies' "capital stock," "securities," "stock options,"
> "equity incentive or stock option plan," "common stock," or
> "voting securities." Technologies undertakes to perform all
> obligations otherwise required to be performed pursuant to the
> Notes by Enterprises with respect to the "capital stock,"
> "securities," "stock options," "equity incentive or stock option
> plan," "common stock," or "voting securities" of Technologies.
> Upon any conversion of the Notes into Conversion Stock (as
> defined in the Notes). Technologies will be the issuer of the
> Conversion Stock rather than Enterprises.

(*See* October 2012 Amendment at ¶ 2, ECF No. 29-1.) Although the plain language of this

provision appears to limit the scope of liability being assumed by Technologies to Enterprises'

obligation to provide conversion stock to Katis, upon Katis's election, in lieu of repayment of

debt, both parties appear to agree that the provision was intended to provide for Technologies'

assumption of all Enterprises' liability under the Notes. Accordingly, Defendants contend that the

October 2012 Amendment constitutes a binding agreement between Katis and Technologies,

permitting Katis to bring a direct breach of contract claim against Technologies in the Original

Action for Enterprises' default on the Notes.

Katis argues that he could not have brought a breach of contract action against

Technologies for repayment of the debt owed under the Notes, because Technologies was not a

party to the October 2012 Amendment. In support, Katis points to language in the October 2012

Amendment identifying himself and Enterprises as the sole parties to the agreement:

> For and in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, *you and Enterprises hereby agree as follows*[.]"

(*See* Oct. 2012 Am., ECF No. 29-1 as Ex. 14 (emphasis added).)

It is well established under Utah law that, as a general rule, "none is liable upon a contract except those who are parties to it." *Shire Dev. v. Frontier Invs.*, 799 P.2d 221, 222–23 (Utah Ct. App. 1990) And courts frequently dismiss breach of contract claims against non-parties. *See Surgenex, LLC v. Predictive Therapeutics, LLC*, 462 F. Supp, 3d 1160, 1168 (D. Utah 2020) (citing cases). Thus, Defendants' contention that Katis had a direct claim against Technologies for breach of contract at the time the Original Action was filed depends on whether Technologies was a party to the October 2012 Amendment.

Defendants argue that Technologies *was* a party to the October 2012 Amendment. They base this contention, not on the language of the October 2012 Amendment itself, but instead on Katis's deposition testimony, in which Katis testified that he and Sutera agreed that "everything about the notes needed to be on [Technologies,]" and that the October 2012 Amendment "was an attempt to fix that mistake of [the] notes not naturally coming up to [Technologies]." (*See* Reply Mem. at 13, ECF No. 62 (quoting Katis Dep. at 122:8-15).)

Because the October 2012 Amendment was reduced to writing, the deposition testimony cited by Defendants constitutes parol evidence and is inadmissible to prove that Technologies was a party to the October 2012 Amendment unless the agreement is ambiguous.[11] *See Tangren*

---

[11]     Neither party has argued that the October 2012 Amendment did not constitute a complete and certain agreement between the parties. Accordingly, the court must presume that "the writing

*Family Tr. v. Tangren*, 2008 UT 20, ¶ 11, 182 P.3d 326 ("[P]arol evidence is admissible only to

clarify ambiguous terms; it is not admissible to vary or contradict the clear and unambiguous

terms of the contract.") (citation an internal quotation marks omitted).

Here, the court finds that an ambiguity exists regarding whether Technologies was an

intended party to the October 2012 Amendment. As Katis correctly notes, the introductory

language of the agreement appears to identify only Katis and Enterprises as parties to the

agreement. And there is nothing else in the October 2012 Amendment that clearly indicates that

Technologies was an intended party to the agreement and bound by its terms.

Other aspects of the October 2012 Amendment, however, could plausibly be construed to

reflect an intention that Technologies be bound by the agreement's terms. For example, the

agreement was printed on Technologies' letterhead. (*See* October 2012 Amendment at 1, ECF

No. 29-1.) And paragraph 2 of the October 2012 Agreement uses language that appears to reflect

an intention that Technologies undertake certain obligations. (*See, e.g.*, *id.* at 2 ("Technologies

undertakes to perform all obligations . . . ."); *id.* at 2 ("Technologies will be the issuer of the

Conversion Stock . . . .").[12] Moreover, Sutera signed the October 2012 Agreement as "President

---

contains the whole of the agreement between the parties" and apply the parol evidence rule.
*Tangren Fam. Tr. v. Tangren*, 2008 US 20, ¶ 12, 182, P.3d 326 ("[W]e have explained that when
parties have reduced to writing what appears to be a complete and certain agreement, it will be
conclusively presumed, in the absence of fraud, that the writing contains the whole of the
agreement between the parties.") (citation an internal quotation marks omitted). *See also
Restatement (Second) of Contract* § 209(3) (1981) ("Where the parties reduce an agreement to a
writing which in view of its completeness and specificity reasonably appears to be a complete
agreement, it is taken to be an integrated agreement unless it is established by other evidence that
the writing did not constitute a final expression.").

[12]      In his motion, Katis argues that this language constitutes evidence of an express or
implied agreement between Enterprises and Technologies for Technologies to assume
Enterprises' liability under the Notes, rather than an agreement between Katis and Technologies.
(*See* Katis's Mot. at 20-22, ECF No. 32.)

and Chief Executive Officer" without indicating whether he was signing on behalf of Enterprises, Technologies, or both. (*See id.* at 3.)

An ambiguity regarding the identity of parties to a contract constitutes a question of fact. *See Masters Ent. Grp., Inc. v. Aurich*, No. 3:18-cv-01314, 2022 WL 2137090 at *13 (M.D. Tenn. June 14, 2022) (unpublished) (citing *Garland v. Bonner*, No. 01A01-9710-CV-00570, 1998 WL 161105 at *2 (Tenn. Ct. App. Apr. 8, 1998) (unpublished)) (identifying the parties to a contract is "a factual rather than legal determination, at least where the contract is ambiguous"); *In re Stafford's in the Field, Inc.*, 192 B.R. 29, 34 (Bankr. D.N.H. 1996) (citing *DeFillipo v. Testo*, 378 A.2d 738, 740 (N.H. 1977)) ("Where the identity of the parties to a contract is ambiguous, the Court looks to all of the facts and circumstances surrounding the transaction. It is a matter of fact for the trial court to determine."). *See also* 17A C.J.S. *Contracts* § 479 (2024) ("[W]here the identity of the parties to a contract is not clear, all of the facts and circumstances surrounding the making of the contract may be considered to determine who are the actual parties."). Such an ambiguity must be resolved by a trier of fact and is not amenable to resolution as a matter of law. *See Masters Ent. Grp.*, 2022 WL 2137090 at *13 ("[T]he factual determination of the identity of parties to a contract is one for the jury where the contract is ambiguous in this regard."). *See also Brady v. Park*, 2019 UT 16, ¶ 53, 445 P.3d 395 ("[W]here a contractual term or provision is ambiguous as to what the parties intended, the question becomes a question of fact to be determined by the fact-finder.") (citation omitted); *Plateau Mining Co. v Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990) ("When ambiguity does exist, the intent of the parties is a question of fact to be determined by the jury.") (citation omitted).

Thus, even assuming for the sake of argument that Defendants are correct that Katis's

possession of a legal claim against Technologies for breach of the Notes would preclude him

from pursuing claims for successor and alter ego liability, ambiguities regarding whether

Technologies was a party to the October 2012 Amendment preclude the court from determining,

as a matter of law, that Katis had a legal claim against Technologies that he could have pursued

in the Original Action. Summary judgment, therefore, cannot be granted on this basis.

### C.     The Statute of Limitations for Claims Based on a Written Agreement is Inapplicable.

Finally, Defendants argue that any direct claim against Technologies for breach of the

Notes, including the October 2012 Amendment, would be barred by a six-year statute of

limitations for claims based on breach of a written agreement. (*See* Defs.' Mot. at 17-18, ECF

No. 29.) Any argument regarding what statute of limitations might apply to a direct claim for

breach of contract, however, has no relevance in this case, and cannot provide a basis for

granting summary judgment, because, as discussed above, Katis has not brought a claim for

breach of the Notes in this action. The court will not speculate about what legal arguments might

bar a different claim brought in a different action under different circumstances.

For all the reasons stated above, Defendants' motion for summary judgment is denied.

### II.    Katis Has Not Shown that He Is Entitled to Summary Judgment on His Successor Liability Claims.

Katis asks the court to grant summary judgment in his favor on his successor liability

claims against both Technologies and nCap. With respect to Technologies, Katis argues the

undisputed facts show that Technologies should be held liability for the Judgment because it

expressly or impliedly agreed to assume Enterprises' liability under the notes. And with respect

to nCap, Katis argues that it is undisputed that nCap impliedly agreed to assume all of

Technologies' liabilities or, alternatively, that the reorganization of Technologies as nCap

constituted a de facto merger.

For the reasons stated below, the court concludes that Katis has failed to satisfy his legal

and evidentiary burden of showing that he is entitled to summary judgment on his successor

liability claims against both Technologies and nCap. Accordingly, his motion must also be

denied.

**A.    Katis Has Not Shown that Technologies Acquired All or Substantially All of Enterprises' Assets.**

The parties appear to agree that Utah law should apply to Katis's successor liability claim

against Technologies. (*See* Katis's Mot. for Summ. J. at 18-19, ECF No. 32 (applying Utah law);

Defs.' Mem. Opposing Summ. J. at 22-23, ECF No. 48 (applying Utah Law).) Accordingly, for

purposes of this motion, the court will assume without deciding that Utah law applies to Katis's

successor liability claim against Technologies.

Utah adheres to the general rule of successor non-liability, subject to four exceptions. The

Utah Court of Appeals explained:

> [W]here one company sells or otherwise transfers all its assets to
> another company the latter is not liable for the debts and liabilities
> of the transferor, except where: (1) the purchaser expressly or
> impliedly agrees to assume such debts; (2) the transaction amounts
> to a consolidation or merger of the seller and purchaser; (3) the
> purchasing corporation is merely a continuation of the selling
> corporation; or (4) the transaction is entered into fraudulently in
> order to escape liability for such debts.

*Macris & Assoc., Inc. v. Neways, Inc.*, 1999 UT App 230, ¶ 15, 986 P.2d 748 (quoting *Floram v.*

*Elliott*, 867 F.2d 570, 575 n.2 (10th Cir. 1989)).

Thus, as a prerequisite for establishing successor liability, a proponent must show that a

company with primary liability has sold or otherwise transferred all of its assets to the alleged successor. Without such a showing, proof that one of the exceptions to the general rule of successor non-liability is irrelevant.

Here, Katis has failed to come forward with evidence to make an initial showing that Enterprises sold or transferred all or most of its assets to Technologies. Indeed, the only potential asset transfer from Enterprises to Technologies that is cited by Katis is the conversion of Enterprises' right to use certain intellectual property from an exclusive license to a non-exclusive license.[13] (*See* Katis's Resp. to Defs.' Mot. at 8, ECF No. 45.) But even assuming the conversion of a license agreement from an exclusive to a non-exclusive license constituted an asset transfer from Enterprises to Technologies, there is no evidence in the record that Enterprises' exclusive right to use the intellectual property at issue constituted all or most of Enterprises assets.[14]

Successor liability typically arises when one company acquires another company's business through an asset purchase. But the evidence in the record here, while apparently incomplete, suggests that Technologies did not acquire its interest in Enterprises by purchasing its assets, but instead became the owner of Enterprises through a stock transaction. Capitalization tables submitted by Defendants with their motion for summary judgment appear to show that

---

[13]     Notably, evidence in the record suggests that the Field of Use License Agreement that was amended from an exclusive to a non-exclusive license was first entered between Enterprises and Technologies in January 2013, which was likely after Technologies acquired all of the stock of Enterprises. (*See* March 2014 Resolution, ECF No. 45-6.) There is no evidence in the record that the intellectual property that was the subject of the Field of Use License Agreement was acquired by Technologies from Enterprises in the first instance.

[14]     Indeed, it is difficult to understand how the conversion of Enterprises' licensing agreement with Technologies could constitute a total transfer of assets to Technologies when Enterprises retained the right to use and sublicense the intellectual property at issue after the conversion, albeit on a non-exclusive basis.

Technologies acquired Enterprises' stock by transferring its own stock to the original shareholders of Enterprises in exchange for Enterprises' stock. (*See* Capitalization Tables, ECF No. 29-1 at Ex. 7.)  Defendants have also submitted a resolution authorizing Technologies to engage in such transactions to acquire the stock of Enterprises. (*See* November 2011 Resolution, ECF No. 29-1 at Ex. 8.)

Technologies' apparent acquisition of Enterprises through a stock transaction, rather than through an asset purchase, is significant because one company's acquisition of all the stock of another company does not effect "a transfer of the assets of the purchased corporation to its new parent." *Advanced Video Techs., LLC v. HTC Corp.*, 103 F. Supp. 3d 409, 419 (S.D.N.Y. 2015) (citing *Oreck v. Engelhart*, 195 A.2d 375, 377 (Del. 1963)). Nor does the mere acquisition of a company's stock transfer the acquired company's liabilities to its new owner. *See Ekotek Site PRP Comm. v. Self*, 945 F. Supp, 994, 1000 (D. Utah 1996) ("[C]hanges in ownership of a corporation's stock does not affect the corporation's liabilities.") (citation omitted). *See also Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91 (3d Cir. 1988) ("Changes in ownership of a corporation's stock will not affect the rights and obligations of the company itself."). *See also A.O. Smith Corp. v. SPX Corp.*, 2007 WI App 19, ¶ 11, 298 Wis. 2d 548, 727 N.W.2d 373 ("[T]he general rule is that, in a stock purchase, the acquired corporation retains all of its liabilities and obligations, known and unknown.") (citation and internal quotation marks omitted). Thus, "[t]he corporation survives as an entity separate and distinct from its shareholders even if all the stock is purchased by another corporation." *Smith Land & Improvement Corp.*, 851 F.2d at 91.

Because evidence that Technologies acquired Enterprises' stock through a transaction

with Enterprises' original shareholders does not prove that Technologies acquired any of Enterprises' assets, proof that Technologies became Enterprises' "holding company" cannot satisfy Katis's obligation to show that Technologies acquired most or all of the assets of Enterprises in order to establish successor liability. Instead, Katis must show that such assets were acquired through one or more other transactions. Katis has failed to present evidence with his motion to meet that burden. Accordingly, the court cannot, as a matter of law, conclude that Technologies is liable for the Judgment against Enterprises, as Enterprises' successor, based on the current record. Katis's motion for summary judgment on his claim against Technologies must, therefore, be denied.[15]

**B.     Katis Has Not Shown that nCap Is Liable for the Judgment as a Successor of Technologies.**

Katis's theory of successor liability against nCap depends on Technologies' liability as Enterprises' successor. Katis does not allege, and has not presented any evidence to show, that nCap acquired any assets directly from Enterprises. Thus, nCap may only be held liable for the Judgment, under a theory of successor liability, if Technologies is first found liable for the Judgment as a successor of Enterprises. As discussed above, Katis's failure to present sufficient evidence to show that Technologies acquired all or most of Enterprises' assets precludes the court from determining, as a matter of law, that Technologies is liable as Enterprises' successor. As a result, the court is precluded from granting summary judgment on Katis's successor liability claim against nCap as well.

---

[15]     Because Katis has failed to meet his burden of showing that Technologies acquired all or most of the assets of Enterprises, the court need not address whether any of the exceptions to successor non-liability apply, including whether Technologies expressly or impliedly agreed to assume Enterprises' obligations under the Notes.

Katis also requests, however, that if the court cannot grant complete summary judgment on his successor liability claims, that it grant partial summary judgment and enter an order determining nCap's liability as a successor of Technologies, which Katis contends is based on facts that are undisputed by Defendants.

While it may be appropriate in some cases to grant partial summary judgment where a movant shows that he or she is entitled to some, but not all, of the relief requested as a matter of law, the court cannot grant partial summary judgment in this instance because Katis has not shown that he is entitled to a determination that nCap is the successor of Technologies as a matter of law.

Katis is correct that the facts he presented regarding the formation of nCap and the transition of Technologies' assets and business to nCap are largely undisputed by Defendants. Nevertheless, Katis must do more than show that material facts are undisputed. He must also show that, given the undisputed facts, he is entitled to a determination that nCap is a successor of Technologies, and therefore liable for all of its obligations, pursuant to the applicable legal standard.

Katis asserts two grounds in support of his assertion that nCap can be held liable as Technologies' successor. First, he claims that nCap impliedly agreed to assume Technologies' liabilities. Second, he claims that the transition of Technologies' business to nCap constituted a de facto merger. Both of these theories of liability depend on a determination that Technologies transferred most or all of its assets to nCap.

In contrast to his claim against Technologies, Katis has presented some evidence to show that Technologies transferred substantial assets to nCap. The Distribution and Contribution

Agreement submitted by Katis shows that Technologies transferred nearly all of its intellectual property assets, through its shareholders, to nCap. (*See* Distribution and Contribution Agreement at ¶¶ 1-3, ECF No. 32-17.) In return, Technologies' shareholders received membership interests in nCap on a pro rata basis according to the percentage of shares they owned in Technologies. (*Id.*) Defendants have not contested that, through this and related transactions, nCap acquired Technologies' business. Thus, the court will assume, for the sake of argument, that nCap acquired nearly all of Technologies' assets when Technologies' business was transferred to nCap.

The general rule when one company acquires most or all of the assets of another company is one of successor *non-liability. See, e.g.*, *Tabor v. Metal Ware Corp.*, 2007 UT 71, ¶ 11, 168 P.3d 814 (adopting "the traditional rule of successor nonliability and its four exceptions as outlined in section 12 of the Restatement (Third) of Torts."). Thus, to overcome the presumption of successor non-liability, a party seeking to establish successor liability must show that an exception applies. But jurisdictions differ on how to apply those exceptions.

Here, Katis has provided the court with no analysis of what jurisdiction's law should apply when evaluating his claim that nCap should be held liable under the doctrine of successor liability as Technologies' successor. For example, when discussing his claim that the transition of Technologies' business to nCap constituted a de facto merger, one of the exceptions to successor non-liability, he cites case law from four different jurisdictions, three of which have no connection to this case. (*See* Katis's Mot. at 22-23, ECF No. 32.) Notably absent from Katis's discussion of the de facto merger exception, however, is any analysis of how a de facto merger claim would be analyzed by Delaware courts, a jurisdiction that could likely provide the rules of decision for his claim against nCap.

While the parties have not analyzed choice of law issues regarding Katis's successor liability claim against nCap and have not provided the court with a sufficient record to conduct a determinative choice of law analysis of its own, evidence in the record suggests that Delaware law would likely apply to Katis's claim against nCap. Technologies was incorporated in Delaware, and nCap is a limited liability company organized under Delaware law. Moreover, the Distribution and Contribution Agreement, which provided for the transfer of most of Technologies' intellectual property assets to nCap, contains a choice of law provision indicating that the transaction should be governed by Delaware law. (*See* Distribution and Contribution Agreement at ¶ 14, ECF No. 32-17.) *See also* Restatement (Second) of Conflicts of Law § 302(2) (1971) (providing that issues involving the rights and liabilities of a corporation are usually determined by "[t]he local law of the state of incorporation.").

Delaware courts recognize the de facto merger exception to successor non-liability, *see Drug, Inc. v. Hunt*, 168 A. 87, 96 (Del. 1933) (adopting de facto merger doctrine), but apply the exception narrowly. To establish a de facto merger under Delaware law, a proponent must show that (1) "one corporation transfers *all* of its assets to another corporation;" (2) "payment is made in stock, issued by the transferee directly to the shareholders of the transferring corporation;" and (3) "in exchange for their stock in that corporation, the transferee agree[d] to assume *all* the debts and liabilities of the transferor." *Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.*, No. CIV.A. S11C-04013ESB, 2011 WL 4826106 at *3 (Del. Super. Ct. Sept. 19, 2011) (emphasis added). These elements are applied strictly and de facto mergers are rarely recognized under Delaware law. *See Spring Real Est., LLC v. Echo/RT Holdings, LLC*, No. CIV.A. 7994-VCN, 2013 WL 6916277 at *5 (Del. Ch. Dec. 31, 2013) ("Typically, Delaware

does not recognize statutorily compliant asset sales as de facto mergers.").

For example, in *Magnolia's at Bethany*, the court held that a transaction did not constitute a de facto merger for successor liability purposes because the transferee company only acquired some, but not all, of the transferor's assets. 2011 WL 4826106 at *3 ("Magnolia's does not, and can not, allege that Artesian acquired all of Meridian's assets because, pursuant to the terms of the Asset Purchase Agreement, Artesian only acquired some of Meridian's assets."). Similarly, in *Spring Real Estate*, the court held there was no de facto merger where the transferee did not acquire all of the assets of the transferor and some of the consideration for the transaction was paid in cash. 2013 WL 6916277  at *5.

If the court were to apply Delaware law to Katis's successor liability claim against nCap, the record provided by Katis would likely be insufficient to establish that the transaction between Technologies and nCap constituted a de facto merger as a matter of law. While, as discussed above, there is evidence that Technologies transferred a substantial portion of its intellectual property assets to nCap, it is undisputed that nCap did not acquire *all* of Technologies' intellectual property assets. Indeed, the Distribution and Contribution Agreement expressly exempted from its transfer provision "the exclusive right of [Technologies] to license such Intellectual Property Interests . . . for use by the United States government." (*See* Distribution and Contribution Agreement at ¶ 1, ECF No. 32-17.) Thus, the right to license intellectual property for use by the United States was retained by Technologies and not transferred to nCap. Accordingly, the Distribution and Contribution Agreement does not show that Technologies transferred *all* of its assets to nCap and cannot be relied on to establish the first element of Delaware's de facto merger doctrine.

Also, Katis has failed to show that nCap agreed to assume *all* the debts and liabilities of Technologies. Katis argues in his motion that the Distribution and Contribution Agreement does not expressly disclaim the assumption of all of Technologies liabilities by nCap, but the absence of such a disclaimer cannot be relied on to establish that nCap affirmatively agreed to assume such liabilities. Moreover, the Distribution and Contribution Agreement does include a provision expressly assuming some of Technologies' liabilities, but only "insofar as the obligations or liabilities concern or pertain to the Intellectual Property Interests" and "provided that [Technologies] shall be responsible to pay any costs, expenses, or fees, and fulfill any obligations, that were incurred or due pursuant to the Related Agreements prior to the effective date of this Agreement." (*See* Distribution and Contribution Agreement at ¶ 4, ECF No. 32-17.) The limited assumption of Technologies' obligations and liabilities cannot be relied on to show that nCap agreed to assume *all* of Technologies' obligations and liabilities. Thus, the record is not sufficient to establish the third element of Delaware's de facto merger doctrine either.

While the court cannot determinatively conclude that Delaware law applies to Katis's successor liability claim on the current record, Katis's failure to conduct any analysis of what legal standard should be applied to his successor liability claim against nCap prevents the court from deciding, as a matter of law, that nCap is subject to successor liability as Technologies' successor.

Katis's request for partial summary judgment must, then, be denied as well.

**<u>Conclusion</u>**

For the reasons stated herein, the court DENIES the motions for summary judgment brought by Katis and Defendants.

SO ORDERED this 5th day of August, 2024.

BY THE COURT:

Clark Waddoups
United States District Judge